**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| GCIU-EMPLOYER RETIREMENT FUND AND BOARD OF TRUSTEES OF THE GCIU-EMPLOYER RETIREMENT FUND, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:14-cv-02303-EFM-GLR |
| COLERIDGE FINE ARTS, et al. | ) ) | |
| Defendant. | ) ) | |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL RESPONSES TO PLAINTIFFS' FIRST INTERROGATORIES AND FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS**</u>

COME NOW Plaintiffs, GCIU-Employer Retirement Fund and Board of Trustees of the GCIU-Employer Retirement Fund (hereinafter "Plaintiffs" or "Fund"), by and through undersigned counsel, and pursuant to Local Rules 7.1 and 37.1(b), and in support of their Motion to Compel Defendants to more fully respond to Plaintiffs' First Set of Interrogatories and Plaintiffs' First Requests for Production of Documents, state as follows:

## I.     NATURE OF THE CASE

The Fund brought this action against Defendants/Appellees Coleridge Fine Arts ("Coleridge") and Jelniki Limited ("Jelniki") to collect withdrawal liability payments, interest, and other charges incurred by Coleridge and Jelniki as a result of a withdrawal from the Fund, a multiemployer pension plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"), 29 U.S.C. § 1001 et seq.  Coleridge and Jelniki, two Irish corporations that acquired Greystone Graphics, Inc. ("Greystone"), are liable for the withdrawal liability assessed

1

to Greystone as members of the same controlled group, which are jointly and severally liable for withdrawal liability under ERISA. 29 U.S.C. § 1301(b)(1); 26 C.F.R. § 1.414(c)-(2)(b)(1)(i).

Coleridge and Jelniki moved to dismiss the Fund's claim based on a lack of personal jurisdiction. The District Court previously granted Coleridge and Jelniki's Motion to Dismiss. The Fund appealed the District Court's order dismissing the action to the Tenth Circuit Court of Appeals. On appeal, the Tenth Circuit reversed and remanded with instructions that the District Court was to "permit jurisdictional discovery of material relating to the question of whether Coleridge or Jelniki, either directly or through their owners, directors, or agents, were involved in the day-to-day management of Greystone." (Order and Judgment, p. 12, attached as Exhibit A). The parties are now engaged in discovery consistent with the Tenth Circuit's Order.

## II.     STATEMENT OF FACTS

### A.     Statutory and Legal Background

The Fund is a multiemployer pension plan within the meaning of ERISA §§ 3(37) and 4001(a)(3), 29 U.S.C. §§ 1002(37) and 1301(a)(3). The Fund is primarily funded by contributions remitted by multiple participating employers with as the result of negotiated collective bargaining agreements with local unions of the Graphic Communications International Union of behalf of employees of those same employers. All principal and income from such contributions and investments thereof is held and used for the exclusive purpose of providing pension benefits to participants and beneficiaries of the Fund and paying the Fund's administrative expenses.

"Congress enacted ERISA, 'to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans.'" *Trustees of Colorado Pipe Indus. Pension Trust v.*

2

*Howard Elec. & Mech. Inc.*, 909 F.2d 1379, 1382 (10th Cir. 1990) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720, 104 S. Ct. 2709, 2713, 81 L.Ed.2d 601 (1984)). The MPPAA, 29 U.S.C. §§ 1381–1461, under which Plaintiffs bring their claims, was enacted as an amendment to ERISA. Congress passed the MPPAA, to ensure the solvency of multiemployer pension plans because prior to the MPPAA, employers could withdraw from such plans without paying their share of the unfunded vested benefits liability. *Colorado Pipe*, 909 F.2d at 1382-83 (citing *Laborers Health & Welfare Trust Fund For N. California v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 545, 108 S. Ct. 830, 834, (1988); *Joyce v. Clyde Sandoz Masonry*, 871 F.2d 1119, 1120 (D.C. Cir.), cert. denied, 493 U.S. 918, 110 S. Ct. 280, 107 L.Ed.2d 260 (1989); *Woodward Sand Co. v. Western Conference of Teamsters Pension Trust Fund*, 789 F.2d 691, 694 (9th Cir.1986)). The MPPAA requires employers withdrawing from a multiemployer pension plan to pay "withdrawal liability," which is defined in the statute as the employer's adjusted "allocable amount of unfunded vested benefits." 29 U.S.C. § 1381. Under 29 U.S.C. § 1383(a)(2), an employer completely withdraws from a multiemployer pension plan when it "ceases all covered operations."

The definition of an "employer" under ERISA includes not only the entity contributing to the pension plan, but all "trades and businesses" that are under "common control" along with that entity. 29 U.S.C. § 1301(b)(1). Section 1301 incorporates the regulations promulgated under section 414(c) of the Internal Revenue Code to define "common control." Under the Internal Revenue regulations, a parent-subsidiary group exists when a common parent owns a "controlling interest" in the relevant subsidiary organization and a "controlling interest" is defined as having at least an 80 percent ownership. 26 C.F.R. § 1.414(c)–2(b)(1) & (2). "It is established law that each member of a control group is jointly and severally liable under ERISA

for withdrawal liability generated by any member's activities." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 120 (4th Cir. 1991) (citing *Board of Trustees of Western Teamsters Pension Trust Fund v. LaFrenz*, 837 F.2d 892, 893 (9th Cir.1988); *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 130 (3d Cir.1986); *McDonald v. Central*, 118 B.R. 903, 914 (D. Md. 1990)). "Congress enacted the controlled group provision 'to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities.'" *Teamsters Pension Trust Fund-Bd. of Trustees of W. Conference v. Allyn Transp. Co.*, 832 F.2d 502, 507 (9th Cir. 1987) (quoting *Board of Trustees v. Johnson, Inc.*, 830 F.2d 1009, 1013 (9th Cir.1987); citing S. Rep. No. 383, 93rd Cong., 2d Sess. 43, reprinted in 1974 U.S. Code Cong. & Admin. News, pp. 4639, 4890, 4928).

### B.    Factual Background

Greystone was a Kansas corporation that was in the business of providing lithograph printing services. Greystone was bound by successive collective bargaining agreements with a local union of the Graphic Communications International Union, under which it was required to make contributions to the Fund on behalf of its employees. Greystone ceased doing business in or about February of 2011, thus, effectuating a complete withdrawal from the Fund.

At the time Greystone withdrew from the Fund, Eugene Reynolds was its President and sat on its Board of Directors. (First Amended Complaint ("FAC"), Doc. 31, ¶ 40; Declaration of Thomas J. Brady ("Brady Decl.") ¶ 2; Exhibit "A" to Brady Decl.; Affidavit of Eugene Reynolds ¶ 23.) Mr. Reynolds actively participated in the management of Greystone and negotiated the terms of the collective bargaining agreement with the Graphic Communications International Union here in the United States. (FAC, Doc. 31, ¶ 30 and Exhibits 3 and 4 of FAC.) The terms of the collective bargaining agreement include the wages to be paid to Greystone's employees

4

along with the contribution rates to be paid to the employees' benefit plans, including to this Plaintiff Fund.  (Id. ¶ 30.)  Kevin Walsh was also on Greystone's Board of Directors.  (FAC, Doc. 31, ¶ 34; Brady Decl. ¶ 2.)

Mr. Reynolds and Mr. Walsh are the owners of and members of the Board of Directors for Defendants Coleridge and Jelniki.  (FAC, Doc. 31, ¶¶ 29, 34.)  At the time Greystone withdrew from the Fund, and the nine years prior, Coleridge, wholly owned by Jelniki, owned 100 percent of Greystone, putting Coleridge and Jelniki in a parent-subsidiary controlled group with Greystone and making both Coleridge and Jelniki jointly and severally liable for Greystone's withdrawal liability as members of the same controlled group.  (Id. ¶ 11.)

Coleridge is an Irish corporation that, like Greystone, is in the business of providing lithograph printing services. (Id. ¶ 13.)  Prior to owning Greystone, Coleridge owned Vile-Goller Fine Arts Printing and Lithographing Company ("Vile-Goller"), a Missouri printing business. (Id. ¶ 16.)  In 1998, Vile-Goller merged with another Kansas printing company to become Greystone.  (Id. ¶ 15 and Exhibit 1 to FAC.)  Like Greystone, Vile-Goller had also been a participating employer in the Fund as a signatory to successive collective bargaining agreements with the Union.  (Id. ¶¶ 17, 23.) Vile-Goller had been contributing to the Fund on behalf of its employees since November 1, 1963. (Id. ¶ 17.)  Mr. Reynolds had been the President of Vile-Goller.  (Id. ¶ 32.) As President of Vile-Goller, Mr. Reynolds, himself, signed one of the collective bargaining agreements obligating the company to contribute to the Fund.  (Id. ¶ 32.)

In 2002, four years after Viller-Goller merged to become Greystone, Coleridge increased its 50 percent ownership of Greystone to 100 percent and Mr. Reynolds became its President. (Id. ¶¶ 20, 29.) During this time, Greystone continued to be signatory to successive collective bargaining agreements with the Union and continued to contribute to the Fund on behalf of its

employees. (Id. ¶ 22.)    In 2006, while Greystone continued operating as a wholly owned subsidiary of Coleridge and Mr. Reynolds continued as its President and Director, Greystone requested the Fund provide it with an estimate of its withdrawal liability.  (Id. ¶ 25.)    Shortly thereafter, in 2007, an actuary hired by Greystone requested the Fund provide him with further information regarding the Fund's actuarial evaluations.  (Id. ¶ 26.)  The actuary advised the Fund that Greystone was looking into the withdrawal liability because it had an immediate impact on Greystone's planning.  (Id. ¶ 26.)  After a period of negotiations with the Union in 2006 and 2007, which as stated above, Mr. Reynolds was involved in, Greystone signed in 2008 its most recent collective bargaining agreement with the Union and continued to contribute to the Fund until it ceased operations in 2011.  (Id. ¶ 24 and Exhibit 2 to FAC.)

The owners of Coleridge, expanded their printing business operations in the United States by conducting business through their subsidiary Greystone.  (Id. ¶ 35; See Brady Decl. ¶¶ 3-5 and Exhibits "B," "C," and "D" of Brady Decl.)  The owners of Coleridge and Jelniki were able to expand their global reach with Greystone's significate operations, presence, and customer base in the United States.  (FAC ¶ 37; See Brady Decl. ¶¶ 3-5 and Exhibits "B," "C," and "D" of Brady Decl.).

On April 15, 2013, a judgment was entered in favor of the Fund against Greystone and its domestic controlled group members: JDV, Co., Greystone Investment Company, and Coleridge Design and Imaging, Inc. (all of which are now defunct companies) for withdrawal liability in the amount of $4,454.092.02.  (FAC ¶ 41 and Exhibit 6 to FAC.)  Through this action, Plaintiffs now seek to collect the withdrawal liability from the solvent control group members, Coleridge and its parent company, Jelniki.  However, Coleridge and Jelniki seek to escape liability by claiming that United States courts do not have personal jurisdiction over them, despite the fact

6

that Plaintiffs' claims arise out of the actions Coleridge and Jelniki purposefully directed toward the United States.

### C.      Discovery Consistent with the Tenth Circuit's Order

Pursuant to the Tenth Circuit Court of Appeals' Order, the parties are now engaged in discovery to determine whether this Court can exercise personal jurisdiction over the Defendants.  On December 13, 2017, Plaintiffs served their First Set of Interrogatories (attached as Exhibit B) and First Requests for Production of Documents to Defendants (attached as Exhibit C).  (Doc. 62).  On January 19, 2018, Defendants served their Answers and Objections to Plaintiffs' First Set of Interrogatories (attached as Exhibit D) and Responses and Objections to Plaintiffs' First Requests for Production of Documents (attached as Exhibit E).  (Doc. 67). Plaintiffs also took the deposition of James Lloyd, the General Manager of Greystone, at the time of its closing and withdrawal from the Plaintiff Fund, on January 26, 2018.

Mr. Lloyd's sworn testimony raised additional questions related to the sufficiency of Defendants' responses to Plaintiffs' First Set of Interrogatories and First Requests for Production of Documents.  In light of Mr. Lloyd's deposition testimony and Plaintiffs' other concerns with Defendants' responses to Plaintiffs' Interrogatories and Requests for Production of Documents, Plaintiffs sent a letter to Defendants' counsel on February 15, 2018, requesting additional information, clarification, and supplementation of Defendants' responses to Plaintiffs' First Set of Interrogatories and First Requests for Production of Documents.  Plaintiffs also moved for additional time to file this Motion to Compel, which this Court granted.  (Docs. 68 and 69).

Counsel for the parties conferred by telephone conference in compliance with Local Rule 37.2 on March 8, 2018 and were unable to resolve the remaining issues regarding the discovery disputes.  Thus, Plaintiffs filed this motion to compel to determine the proper scope of discovery.

### III.   QUESTION PRESENTED

Whether Defendants should be compelled to supplement their responses to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents to Defendants as set forth below because the written discovery requests are within the proper scope of discovery allowed by the Tenth Circuit because they are related to the question of whether Defendants, either directly or through their owners, directors, or agents, were involved in the day-to-day management of Greystone.

### IV.   ARGUMENTS AND AUTHORITIES

#### A.  Legal Standard

Under Fed. R. Civ. P. 26(b)(1), discovery may be obtained "regarding any nonprivileged matter that is relevant to any party's claim or defense." "Relevancy is broadly construed during the discovery phase, and a request for discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party." *Design Basics, L.L.C. v. Strawn*, 271 F.R.D. 513, 523 (D. Kan. 2010) (internal citations omitted). Generally, "[a] request for discovery should be allowed unless it is clear that the information sought can have no possible bearing on the claim or defense of a party." *Sheldon v. Vermonty*, 204 F.R.D. 579, 689-90 (D. Kan. 2001) (internal citations omitted).   Even in cases of jurisdictional discovery, as here, "the court may receive interrogatories, depositions, or 'any combination of the recognized methods of discovery' to help it resolve the jurisdictional issue. The court has discretion as to the type and amount of discovery to allow." *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008) (internal citations and quotations omitted).  In this case, the Tenth Circuit permitted Plaintiffs to discover "material relating to the question of whether Coleridge or Jelniki, either directly or through their owners,

directors, or agents, were involved in the day-to-day management of Greystone." (Order and Judgment, p. 12, Exhibit A).

"When the discovery sought appears relevant on its face, the party resisting discovery has the burden to establish that the requested discovery does not come within the scope of relevance." *Cardenas v. Dorel Juvenile Group, Inc.*, 232 F.R.D. 377, 380 (D. Kan. 2005) (quoting *Owens v. Sprint/United Mgmt. Co.*, 221 F.R.D. 649, 652 (D. Kan. 2004)). The party making the discovery request has the burden if relevance in not readily apparent. *Id.*

### B. Plaintiffs' Written Discovery Requests to Defendants

The majority of the disputes regarding the written Interrogatories and Requests for Production of Documents to Defendants centers around the issue of the proper scope of jurisdictional discovery. As stated above, the Tenth Circuit expressly permitted Plaintiffs to discover "material relating to the question of whether Coleridge or Jelniki, either directly or through their owners, directors, or agents, were involved in the day-to-day management of Greystone." (Order and Judgment, p. 12, Exhibit A). The disputed requests are discussed below:

1. Eugene Reynolds's Position and Job Duties with Respect to Greystone and Defendants:

   Interrogatory No. 23: State the positions held by Eugene Reynolds in the Respondents and the Reporting Business from 1998 through 2011. For each position held, please state the dates the position was held and describe the job duties performed.

Defendants objected to this Interrogatory on the basis that it is overly broad and not reasonably limited in time. Defendants further objected on the basis that the Interrogatory is outside the scope of permissible discovery. Defendants then provided a partial response subject to their objections. (Exhibit D, p. 14). Despite Defendants' objections, this Interrogatory is

exactly the type of information that the Tenth Circuit permitted Plaintiffs to discover.    Mr. Reynolds was the President of Greystone and a director of Coleridge during the relevant period from 1998, the year Defendants acquired Greystone, to 2011, the year Greystone withdrew from the Plaintiff Fund.   On that basis, the Interrogatory is narrowly tailored to the relevant period of time.   Additionally, the jobs duties performed by Mr. Reynolds, who was actively involved in both Defendants and Greystone as Director and President respectively, is relevant to the determination of "whether Defendants, either directly or through their owners, directors, or agents, were involved in the day-to-day management of Greystone."  This Interrogatory directly addresses the question of what titles and job duties Mr. Reynolds had in both companies and bears directly on the question of his involvement with both companies during the relevant period between the date Defendants acquired ownership of Greystone (1998) and its closing and withdrawal from the Plaintiff Fund (2011).

This Interrogatory is exactly the type of information the Court entitled to Plaintiffs to seek.   The Court allowed discovery into the Defendants' involvement with Greystone to allow the Plaintiffs to explore whether there are sufficient contacts to subject the Defendants to jurisdiction in this case.   In determining whether and to what extent the Defendants were involved in Greystone's day-to-day operations, the Plaintiffs are entitled to determine whether Defendants' employees were involved with Greystone and the extent of their involvement.   As such, this is a proper and relevant information request bearing on jurisdictional discovery in this matter.

Finally, with respect to Interrogatory No. 23, Defendants fail to provide a description of the job duties performed by Mr. Reynolds in his positions with Defendants and Greystone. (Exhibit D, p. 14).   It is well settled law that objections to discovery requests must be specific,

and the Court will only consider objections that have been timely asserted.  *See, e.g.*, *Cardenas v. Dorel Juvenile Group, Inc.*, 230 F.R.D. 611, 615 (D. Kan. 2005) (internal citations omitted). Defendants fail to assert any objection to providing a description of Mr. Reynolds's job duties. Therefore, any objection to this portion of the Interrogatory is untimely and waived.

    2. <u>Travel Information and Documents for the Irish Defendants to the Kansas City Metropolitan Area:</u>

     <u>Interrogatory No. 24:   State whether Eugene Reynolds, James Lloyd, or any other person on behalf of either or both of the Respondents travelled to the Kansas City, Kansas or Kansas City, Missouri metropolitan areas from 1998 to the present.  If so, please state the following: (a) the person who traveled to the area, (b) the dates the travel took place, (c) the purpose of the travel, and (d) identify any notes, e-mails, receipts of travel, or any other documents associated with the identified person's travel to the Kansas City metropolitan area and purpose of that travel.</u>

     <u>Request No. 11 [sic].  Any notes, e-mails, receipts of travel, or any other documents associated with travel and/or business performed in the Kansas City, Kansas and/or Kansas City, Missouri metropolitan area from 1998 to the present.</u>

Defendants objected to this Interrogatory and related Request on the basis that they are overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence as they are not reasonably limited in time and vague.  Defendants further objected on the basis that the Interrogatory is outside the scope of permissible discovery. (Exhibit D, p. 14; Exhibit E, p. 9).   Defendants then provided a partial response to the Interrogatory subject to their objections that was vague and provides no information to Plaintiffs concerning what agents or employees were traveling to the Kansas City area and for what purposes. (Exhibit D, pp. 14-15).  Plaintiffs provided no responsive documents to the Request for Production of Documents. (Exhibit E, p. 9).

During the deposition of James Lloyd, he stated that Eugene Reynolds traveled to the Kansas City area to meet with him on several occasions.  He would also regularly consult with

Eugene Reynolds regarding the management of Greystone and the hiring and firing of employees. He would also consult with Eugene Reynolds concerning bargaining unit members needed for jobs. (Deposition of James Lloyd, attached as Exhibit F, pp. 19-20, 39-40). Thus, Defendants vague response that "Mr. Reynolds traveled to Kansas City, Kansas and Kansas City, Missouri during the period from 1998-2011, not to provide direction to Greystone, but to be aware of how Greystone was performing as Defendants had invested in Greystone" is contradicted by James Lloyd's deposition testimony. (Exhibit D, p. 15; Exhibit F, pp. 19-20).

Further, James Lloyd also testified that Kevin Walsh also traveled to the Kansas City area to discuss the business and operations of Greystone. (Exhibit F, pp. 19-20). However, Defendants failed to even mention Mr. Walsh's travel to the Kansas City area.

James Lloyd also testified that Greystone was not paying for the travel of Mr. Walsh and/or Mr. Reynolds to the Kansas City area to provide business-related advice concerning the day-to-day operations of Greystone. (Exhibit F, p. 19). Thus, Plaintiffs can only deduce that someone other than Greystone was paying for Mr. Reynolds and Mr. Walsh to travel to Kansas City. These discovery requests are tailored to determine who paid for the travel expenses incurred and are thus relevant to the determination of whether Defendants were involved in the day-to-day operations of Greystone.

Again, the discovery of this type of information is exactly why the Tenth Circuit allowed jurisdictional discovery in this case. As stated above, Plaintiffs are allowed to determine what involvement Defendants, either directly or through their directors or representatives, had with Greystone in order to determine whether and to what extent the Defendants were involved in Greystone's day-to-day operations, the Plaintiffs are entitled to determine whether Defendants' employees were involved with Greystone and the extent of their involvement. As such, this is a

12

proper and relevant information request bearing on jurisdictional discovery in this matter and this Court should order Defendants to more fully respond.

    3.  <u>Corporate Records:</u>

    <u>Interrogatory No. 25: Please state the current location of the Greystone Graphics, Inc.'s corporate records and payroll records.</u>

    <u>Request No. 12 [sic]: All corporate records and payroll audit records of Greystone Graphics, Inc. from November 1, 2008 to the present.</u>

Plaintiffs are entitled to the corporate records of Greystone Graphics from November 1, 2008 through the present per the Judgment entered by the United States District Court for the Central District of California giving Plaintiff GCIU-Employer Retirement Fund the right to Greystone Graphics' "books and records covering the period November 1, 2008 to date." (Judgment, attached as Exhibit G). Defendants objected to these discovery requests as being overly broad, unduly burdensome, not reasonably limited in time, and not within the scope of permissible discovery. (Exhibit D, p. 15; Exhibit E, p. 9). In responding to Interrogatory No. 25, Defendants provided only the most broad and general response that Greystone's records are stored "in or around Kansas City." (Exhibit D, p. 15). Further, that information is only provided upon information or belief. (Exhibit D, p. 15). James Lloyd's deposition testimony provided a little more information concerning the corporate records of Greystone. Specifically, Mr. Lloyd testified that Eugene Reynolds, the Director of the Defendants and President of Greystone, was responsible for the storage of Greystone's records. (Exhibit F, pp.14-15).

During the parties' telephone conference to discuss the disputed discovery requests, counsel for Defendants revealed that Greystone's remaining records are located in a storage facility somewhere in Bonner Springs, Kansas. Plaintiffs have a court order granting them access to these documents. Greystone was the wholly owned subsidiary of Defendants.

13

Numerous courts "have concluded that a parent corporation has a sufficient degree of ownership and control over a wholly owned subsidiary that it must be deemed to have control over documents located with that subsidiary." *Dietrich v. Bauer*, 95 Civ. 7051(RWS), 2000 WL 1171132 at *3 (S.D.N.Y. Aug. 16, 2000) (citing *United States v. International Union of Petroleum and Indus. Workers, AFL–CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989) ("A corporation must produce documents possessed by a subsidiary that the parent corporation owns or wholly controls."); *Alden v. Time Warner, Inc.*, No. 94 Civ. 6109, 1995 WL 679238, at *2 (S.D.N.Y. Nov. 14, 1995) (corporate parent required to produce documents held by its subsidiary); *Camden Iron & Metal v. Marubeni Am. Corp.*, 138 F.R.D. 438, 441 (D.N.J. 1991) (parent corporation has control over documents in physical control of wholly-owned or controlled subsidiary); *In re Uranium Trust Litigation*, 480 F. Supp. 1138, 1152 (N.D. Ill. 1979) (corporate parent must produce documents of wholly-owned subsidiary but not documents of 43.8%-owned subsidiary which conducted its corporate affairs separately); *Hubbard v. Rubbermaid, Inc.*, 78 F.R.D. 631, 637 (D. Md. 1978) (parent corporation must produce documents held by wholly-owned subsidiaries and fact that subsidiaries were separate corporate entities was irrelevant).

In addition, in the District of Kansas,

"Courts have universally held that documents are deemed to be within the possession, custody or control if the party has actual possession, custody or control or has the legal right to obtain the documents on demand." *Heartland Surgical Specialty Hospital, LLC. v. Midwest Division, Inc.*, No. 05–2164, MLB, 2007 WL 950282 at *16, 2007 U.S. Dist. LEXIS 22090 at *61 (D. Kan. March 26, 2007) (citing *Starlight International v. Herlihy*, 186 F.R.D. 626 (D. Kan. 1999)) (emphasis added). Here, based on the unambiguous section of the MTA, defendants own the designs and thus, the court infers, have the legal right to obtain the documents on demand. Moreover, while courts have cautioned that "[l]egal ownership is not determinative of whether a party has. . . control of a document for the purposes of Rule 34" the court takes this to mean: if the third-party has "legal ownership" of the document, the inquiry as to control does not end there. *Resolution Trust Corp. v. Deloitte & Touche*, 145 F.R.D. 108, 110 (D. Colo. 1992); *see also* 2–15 Moore's Federal Practice and Procedure § 15.16

(2007) ("It should be noted that legal ownership of the requested items or things is not determinative [.]").  Conversely, if a party does have legal ownership, as here, the court finds a strong indication that defendants possess the very definition of "control" over these documents.

Moreover, a party has "control" of documents under Rule 34 if such party has retained "any right or ability to influence the person in whose possession the documents lie." *Super Film of America, Inc. v. UCB Films, Inc.*, 219 F.R.D. 649, 651 (No. 05-2164-MLB, 2007 WL 950282 (D. Kan. Mar. 26, 2007) (citing *Lone Star Steakhouse & Saloon, Inc. v. Liberty Mutual Insurance Group, et. al.*, 2003 WL 21659662, at *2 (D. Kan.  June 4, 2003)).

*Ice Corp. v. Hamilton Sundstrand Corp.*, 245 F.R.D. 513, 521 (D. Kan. 2007).  Given the facts that Mr. Reynolds, the President and Director of Greystone Graphics and the Director of Defendants, is also the only known person with knowledge of where the documents of Greystone Graphics are located and the records of Greystone Graphics are being stored nearby in Bonner Springs, Kansas, this Court should allow Plaintiffs to enforce their right to discover those documents.

Due to Mr. Reynolds position in both Greystone and the Defendants, he likely has the requisite control or the authority to obtain control of Greystone's remaining records.  Plaintiffs have a judgment allowing them access to Greystone's records from November 1, 2008 to the present.  Due to the underlying judgment and the information those records likely contain that would reveal the Defendants' and their representatives' involvement in the day-to-day operations of Greystone, Plaintiffs are entitled to receive those documents.

4.  Requests for Production of Documents to Defendants

Requests 3-5, 8[sic], and 9[sic] are all tailored to discovering what documents and e-mails Defendants have: (1) between Defendants and Greystone (Request No. 3), (2) between Defendants and the local unions of the Graphics Communications International Union (Request No. 4), (3) concerning collective bargaining negotiations or the collective bargaining agreement

signed by Greystone (Request No. 5), (4) internally among the Defendants discussing the collective bargaining negotiations between Greystone and the Union (Request No. 8[sic]), and (5) internally among the Defendants discussing Greystone's potential or actual withdrawal from the Plaintiff Fund (Request No. 9[sic]). (Exhibit E, pp. 4-5, 7-8).

Defendants objected to all of these Requests as overly broad, unduly burdensome, not properly limited in time or scope, and outside the scope of permissible discovery. These Requests are tailored to determine the Defendants' involvement with the collective bargaining negotiation process and agreement. James Lloyd testified that Mr. Reynolds was involved in the approval of the collective bargaining agreement. (Exhibit F, p. 21). Additionally, Requests 3-5 are limited to the period between 1998, the year Defendants acquired Greystone, and 2011, the year Greystone closed and withdrew from the Plaintiff Fund. Requests 8[sic] and 9[sic] are not limited in time as the Defendants likely discussed the potential withdrawal of Greystone prior to their acquisition of Greystone in 1998, during various negotiations of the collective bargaining agreements with the Union between 1998 and 2011, and after the actual withdrawal of Greystone from the Plaintiff Fund after Greystone closed in 2011 and was assessed withdrawal liability by the Fund. These Requests have a direct relationship with the Defendants' knowledge of the potential and actual withdrawal liability of Greystone and bear directly on the question of whether this Court can assert personal jurisdiction over Defendants to determine whether they are liable, as members of the same controlled group, for the withdrawal liability incurred by Greystone. Thus, these Requests are relevant to the jurisdictional discovery allowed in this matter and Defendants should be required to respond.

   5. Request No. 4[sic]: Any notes, logs, diaries, calendars, audio or video recordings, photographs or other records of events kept by Respondents pertaining to the Reporting Business's collective bargaining negotiations or agreements with local unions of the Graphic Communications International

<u>Union and/or the International Printing & Graphics Communication Union
from 1998 through 2011.</u>

This Request seeks to discover the notes, diaries, calendars, and other records of events kept by Defendants and their representatives in the course of negotiating the collective bargaining agreements with the Union from 1998 through 2011.   Defendants objected to this Request on the basis that overly broad and unduly burdensome as it is not properly limited in time or scope, vague, and outside the scope of permissible discovery.   (Exhibit E, p. 6).   The same arguments as stated above apply to this Request.   This Request is tailored to determine the Defendants' involvement with the collective bargaining negotiation process and agreement. James Lloyd testified that Mr. Reynolds was involved in the approval of the collective bargaining agreement.   (Exhibit F, p. 21).   This Request has a direct relationship with the Defendants' knowledge of the potential and actual withdrawal liability of Greystone and bear directly on the question of whether this Court can assert personal jurisdiction over Defendants to determine whether they are liable, as members of the same controlled group, for the withdrawal liability incurred by Greystone.   Thus, this Request is relevant to the jurisdictional discovery allowed in this matter and Defendants should be required to respond.

WHEREFORE, Plaintiffs respectfully request this Court to enter an Order compelling Defendants to respond to Plaintiffs' First Set of Interrogatories and Defendants' First Requests for Production of Documents and for such further relief as this Court finds just and appropriate.

Respectfully submitted,

BLAKE & UHLIG, P.A.

/s/ Michael E. Amash
   Michael E. Amash
   KS Bar No. 22998
   Blake & Uhlig, P.A.
   753 State Avenue, Suite 475
   Kansas City, Kansas 66101
   Telephone: 913-321-8884
   Facsimile: 913-321-2396
   mea@blake-uhlig.com
   ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of March, 2018, a true and correct copy of the above and foregoing was electronically filed with the court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

/s/ Michael E. Amash