# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

GCIU-EMPLOYER RETIREMENT FUND
AND BOARD OF TRUSTEEES OF THE
GCUI-EMPLOYER RETIREMENT FUND,

    *Plaintiffs,*

vs.

COLERIDGE FINE ARTS, et al.

    *Defendants.*

Case No. 14-2303-EFM-KGG

## MEMORANDUM AND ORDER

Plaintiffs GCIU-Employer Retirement Fund and its Board of Trustees ("Plaintiffs" or "the Fund") bring this action against two Irish companies, Coleridge Fine Arts ("Coleridge") and Jelniki Limited ("Jelniki"). Plaintiffs seek to collect withdrawal liability payments under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). Defendants previously moved for dismissal under Fed. R. Civ. P. 12(b)(2) asserting that the Court lacked personal jurisdiction. The Court agreed and dismissed the case.

On appeal, the Tenth Circuit Court of Appeals agreed that it did not appear that there was a basis for personal jurisdiction. The circuit, however, reversed the dismissal because it found that

this Court should have allowed jurisdictional discovery. Upon remand, the parties conducted limited discovery.

Defendants are again before the Court moving for dismissal on the basis that the Court lacks personal jurisdiction. The Court finds that there are insufficient minimum contacts by Defendants and that Plaintiffs' injuries do not arise from Defendants' contacts. Thus, the Court grants Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 39).

### I. Factual and Procedural Background[1]

Plaintiff GCUI-Employer Retirement Fund is a multiemployer pension plan. Plaintiff Board of Trustees is made up of the present trustees who are the named fiduciaries of the Fund. The Fund is primarily funded by contributions remitted by multiple participating employers as a result of negotiated collective bargaining agreements ("CBAs").

Defendant Coleridge is a corporation domiciled in the Republic of Ireland. Defendant Jelniki is a company domiciled in the Republic of Ireland. Coleridge is a wholly-owned subsidiary of Jelniki.

Coleridge wholly-owned Greystone Graphics, Inc. ("Greystone), a Kansas corporation, as of 2002. A collective bargaining agreement ("CBA") bound Greystone to make contributions to Plaintiff Fund. In February 2011, Greystone ceased doing business and is now a defunct corporation. Its cessation of business effectuated a complete withdrawal from the Fund.

---

[1] The facts are taken from Plaintiffs' Amended Complaint, as well as the exhibits attached to the Amended Complaint and the exhibits attached to Defendants' and Plaintiffs' briefing and supplemental briefing. Additional facts were set forth in this Court's previous Order. Doc. 52.

On April 15, 2013, a default judgment was entered by the United States District Court in the Central District of California against Greystone, JDV, Co.,[2] Greystone Investment Company, and Coleridge Design and Imaging, Inc., in the amount of $4,454,092.02 in withdrawal liability.

In 2014, Plaintiffs filed suit against Coleridge and Jelniki asserting that they were affiliated with Greystone and Coleridge Design and Imaging, Inc., and were liable for the withdrawal liability. Defendants filed a Motion to Dismiss (Doc. 39) asserting that the Court lacked personal jurisdiction over the foreign defendants. Defendants submitted an affidavit to the Court in which Eugene Reynolds, director and shareholder of Coleridge, averred that Defendants Coleridge and Jelniki never had direct control over the daily affairs of Greystone. Defendants had separate budgets, payroll, and business records from Greystone. Defendants did not have the authority to make business decisions related to Greystone and did not conduct business on behalf of Greystone. Similarly, Greystone did not conduct business on behalf of Defendants. The Court agreed that there was no personal jurisdiction over Coleridge and Jelniki and dismissed the case.

On appeal to the Tenth Circuit Court of Appeals, the circuit found that the record "[fail[ed] to show that either Coleridge or Jelniki had sufficient minimum contacts with the forum to permit the federal courts to exercise specific personal jurisdiction."[3] The Tenth Circuit, however, found that this Court abused its discretion when it did not permit Plaintiff to conduct further discovery on the personal jurisdiction issue. The circuit remanded the case directing the Court to permit jurisdictional discovery on the "question of whether Coleridge and Jelniki, either directly or

---

[2] Coleridge also owns 100 percent of JDV, Co.

[3] *GCIU-Employer Ret. Fund v. Coleridge Fine Arts*, 700 F. App'x 865, 870 (10th Cir. 2017).

through their owners, directors, or agents, were involved in the day-to-day management of Greystone."[4]

The parties conducted discovery and the following facts come from this additional discovery. Kevin Walsh is an owner and member of the Board of Directors of Coleridge and Jelniki. Walsh has served on Coleridge's Board of Directors for thirty years. He also served as Coleridge's Managing Director.

When Walsh was deposed, he testified that he visited Greystone's facility in Kansas City approximately four times between 1998 and 2005.[5] He did not visit Kansas City after 2005. Walsh testified that Coleridge paid for his travel to Kansas City, and that he made those trips on behalf of Coleridge.

Walsh stated that he would communicate with Greystone's General Manager ("GM") James Lloyd via phone and electronic mail. When visiting Greystone on the approximate four occasions,[6] Walsh met with Lloyd and would discuss any concerns that Lloyd had. In addition, Walsh would meet with other Greystone employees. Walsh stated that he had no involvement in the day-to-day operation of Greystone and did not have the ability to tell Lloyd how to run the company.

---

[4] The circuit stated that a one-page agreement from March 15, 2007, raised the possibility that Coleridge was "involved in the day-to-day management of Greystone, or at least in the negotiation of its collective bargaining agreement." *Id.* at 871.

[5] In 1998, a company that Coleridge owned merged with another company. The two companies became Greystone, and Coleridge was the 50 percent owner and retained the right to increase its ownership. In 2002, Coleridge acquired the remaining 50 percent of Greystone.

[6] Lloyd estimated that Walsh traveled to Kansas City approximately five to ten times.

James Lloyd was the Chief Financial Officer ("CFO") and General Manager of Greystone. Lloyd was also on Greystone's Board of Directors. He was not on Coleridge's or Jelniki's board, and he did not receive any renumeration from Coleridge or Jelniki.

As CFO, Lloyd was responsible for the accounting and books. As GM, Lloyd was responsible for leading a management team and making decisions related to Greystone's production and marketing. Lloyd set the financial goals for Greystone. Walsh could ask questions about the projections, but he did not offer advice or input. Lloyd approved travel expenses, equipment purchases, and day-to-day business expenses. He did not need approval from anyone to make decisions.

Lloyd testified that Greystone sent supplies to Coleridge three or four times. The supplies were purchased by Greystone in the United States. Lloyd did not know if Coleridge reimbursed Greystone.

Greystone did not own its facility in Kansas City. It leased it from Greystone Investment Company. JDV Co. owned Greystone Investment Company. JDV is a wholly owned subsidiary of Coleridge.

Lloyd and Walsh testified that, in 2000, Coleridge provided a loan to Greystone in the amount of $250,000.[7] Lloyd made the request for a loan to Eugene Reynolds, another owner and member of the Board of Directors of Coleridge and Jelniki. Lloyd and Reynolds discussed the terms of the loan. Reynolds testified that JDV Co. made the loan to Greystone. There are no loan documents. Reynolds and Walsh stated that the loan was expected to be paid back, but Greystone was never able to make any payments.

---

[7] In 2000, Coleridge had a 50 percent ownership interest in Greystone.

Reynolds met with Lloyd multiple times a year during the duration of Lloyd's employment with Greystone. Reynolds testified that Greystone paid for his flights when he would travel to Kansas City for business.[8] In addition, he testified that he used a Greystone credit card and that he stayed at an apartment that Greystone paid for.

In 2007, Greystone and union employees negotiated a CBA. Lloyd testified that Reynolds was involved in the negotiating of the 2006/2007 CBA in an advisory capacity. Lloyd also stated that he discussed with Reynolds withdrawal liability during the 2006/2007 negotiations. Lloyd had the ultimate authority to approve a union contract.

There is a one-page agreement, dated March 15, 2007, signed by Reynolds and several members of the union. In this agreement, it states that "Greystone and Local 16-C have agreed to a meeting between the Union's committee and Eugene Reynolds to give the Union the opportunity to communicate their concerns directly to the owner. The undersigned agree that this meeting is not a negotiation session and that all comments are off the record."[9]

During Reynolds' deposition, he was asked about this agreement. He stated that he does not recall that the meeting ever took place. He also stated that "off the record" meant that it was completely unofficial and that it was not a negotiation session. Reynolds was asked about the statement communicating their concerns directly to the owner and whether it was accurate that his

---

[8] Lloyd testified that Greystone did not pay for the travel of Reynolds and Walsh, but he was unaware of who paid for such expenses.

[9] The circuit found that this one-page agreement was ambiguous as to the word "owner" and raised the possibility that Coleridge or Jelniki were involved in the day-to-day management of Greystone or in the negotiation of its CBA. *Id.* The circuit also noted, however, that one meeting was "not a sufficient minimum contact to support the exercise of specific jurisdiction, particularly when the Fund has not alleged how its injuries arose from that meeting." *Id.*

"capacity in this meeting was as the owner of Greystone." He responded, "representing the owners."

On June 15, 2007, a letter was sent to the union on Greystone letterhead. Reynolds signed this letter. He stated that someone at Greystone had drafted the letter for Reynolds to send because communications had broken down and a strike had either started or was imminent.

In 2011, when Greystone withdrew from the Fund, Reynolds was Greystone's President and sat on its Board of Directors. Lloyd and Reynolds were involved in the winding down of Greystone. Reynolds, through Dollard Packaging, pays for the storage facility in which Greystone's corporate records are currently stored. Greystone's physical assets were auctioned off when it was winding up. Coleridge and Jelniki did not acquire any of Greystone's property.

Defendants are again before this Court asserting that the case should be dismissed for lack of personal jurisdiction.

## II. Legal Standard

A plaintiff opposing a motion to dismiss based on lack of personal jurisdiction bears the burden of showing that jurisdiction over the defendant is appropriate.[10] In a pretrial motion to dismiss, when the matter is decided on the basis of affidavits and written materials, the plaintiff is only required to make a prima facie showing that personal jurisdiction is proper to avoid dismissal.[11] Once the plaintiff makes a prima facie showing, the defendant must "present a

---

[10] *Thermal Components Co. v. Griffith*, 98 F. Supp. 2d 1224, 1227 (D. Kan. 2000) (citing *Kuenzle v. HTM Sport–Und Freizeitgerate AG*, 102 F.3d 453, 456 (10th Cir. 1996)).

[11] *Id*.

compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.' "[12]

"The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."[13] "However, only the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true."[14] " 'The plaintiff has the duty to support jurisdictional allegations in a complaint by competent proof of the supporting facts if the jurisdictional allegations are challenged by an appropriate pleading.' "[15]

### III. Analysis

Plaintiffs bring a claim for withdrawal liability under ERISA and the MPPAA. Under the MPPAA, an employer incurs withdrawal liability to a multiemployer plan if the employer partially or completely withdraws from the plan.[16] Pursuant to 29 U.S.C. § 1383(a)(1), a complete withdrawal occurs if "an employer permanently ceases to have an obligation to contribute under the plan." Businesses that are under "common control" are treated as a "single employer" and are jointly and severally liable for an affiliate business.[17]

---

[12] *Id*. (quoting *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998)).

[13] *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (internal quotations omitted).

[14] *Id*. (citation omitted)

[15] *Id*. at 1508 (quoting *Pytlik v. Prof'l Res., Ltd.*, 887 F.2d 1371, 1376 (10th Cir. 1989)).

[16] 29 U.S.C. § 1381.

[17] *See* 29 U.S.C. § 1301(b)(1); *see also Cent. States, Se. and Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 873-74 (7th Cir. 2006) ("For purposes of determining withdrawal liability, ERISA

Federal Rule of Civil Procedure 4(k)(2) is the basis for personal jurisdiction "[w]hen a plaintiff's claims arise under federal law and the defendant is not subject to the jurisdiction of any state's court of general jurisdiction."[18] Here, Plaintiff's claim arises under federal law and there is no state court that has jurisdiction over Defendants. Under Rule 4(k)(2), a plaintiff must show that "the exercise of jurisdiction comports with due process."[19] The Due Process Clause of the Fifth Amendment guides the analysis.[20]

The relevant question is whether the non-resident defendant had sufficient contacts with the forum.[21] "[A] federal court may exercise specific jurisdiction over a foreign defendant if the defendant purposefully directed its activities at the forum and the plaintiff's injuries arose from the defendant's forum-related activities."[22] In this case, the forum is the United States in general, rather than Kansas in particular. Thus, the appropriate question is whether Defendants purposefully directed their activities toward the United States, and whether Plaintiffs' alleged injuries relate to these forum-related activities. Specifically, the Tenth Circuit remanded the case to determine whether there is any evidence that Defendants Coleridge or Jelniki, either directly or through their owners, directors, or agents, were involved in the day-to-day management of Greystone.

---

defines an 'employer' as the business that directly participates in the plan, as well as those entities that constitute the business's 'control group.' All entities constituting the control group incur withdrawal liability.") (citing 29 U.S.C. § 1301(b)(1)).

[18] *GCIU-Employer Ret. Fund,* 700 F. App'x at 867-68.

[19] *Id.* at 868 (citing *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007)).

[20] *Id.*; *see also Peay v. Bellsouth Med. Assistance Plan*, 205 F.3d 1206, 1210 (10th Cir. 2000).

[21] *GCIU-Employer Ret. Fund,* 700 F. App'x at 868; *see also Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004).

[22] *GCIU-Employer Ret. Fund*, 700 F. App'x at 868 (citation omitted).

"[J]urisdiction cannot be premised on corporate affiliation alone even when the claims arise under the MPPAA."[23] "A holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity."[24] "Companies conducting business through their subsidiaries can qualify as transacting business in a state, provided the parent exercises sufficient control over the subsidiary."[25] Stock ownership, by itself, does not subject the parent corporation to in personum jurisdiction of the subsidiary corporation.[26] A defendant's contacts with the forum must be individually considered.[27]

Plaintiffs contend that Coleridge and Jelniki, through their officers and directors Reynolds and Walsh, inserted themselves in the day-to-day business of Greystone on behalf of Greystone's parent corporations in Ireland (Coleridge and Jelniki). They contend that the following facts support their argument: (1) Coleridge used Greystone to purchase and acquire supplies in the United States three or four times and it is unclear whether Coleridge reimbursed Greystone for these supplies, (2) Coleridge made a $250,000 loan to Greystone in 2000 and it was never repaid, (3) Coleridge owned the physical building occupied by Greystone, (4) Reynolds participated in a 2006/2007 CBA negotiation involving Greystone's employees, (5) Reynolds interacted with Greystone's GM and CFO Lloyd concerning management and operations of Greystone, and (6)

---

[23] *GCUI-Employer Ret. Fund*, 700 F. App'x at 870.

[24] *Benton*, 375 F.3d at 1081 (quotation marks and citation omitted).

[25] *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1278 (10th Cir. 2005).

[26] *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1364 (10th Cir. 1974).

[27] *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984).

Walsh had communications with Lloyd and visited at least four times between 1998 and 2005 with Coleridge paying for Walsh's travel.

At first, it may appear that these contacts demonstrate that Walsh and Reynolds were involved in Greystone's affairs on more than just a peripheral basis. Upon deeper inspection, however, these contacts are superficial and do not demonstrate day-to-day involvement in Greystone's business.

As to the acquisition of supplies, this only occurred three or four times over a thirteen-year period (1998-2011) in which Coleridge partly or wholly owned Greystone. This fact is not indicative of Greystone operating on behalf of Coleridge. Indeed, it simply demonstrates that Greystone sporadically purchased a supply in the United States that Coleridge could not obtain in Ireland. Nothing about this fact demonstrates day-to-day involvement of Coleridge and Jelniki in Greystone's affairs.

In 2000, Coleridge loaned $250,000 to Greystone.[28] Generally, "parent financing of the subsidiary will not make the subsidiary a mere instrumentality."[29] Plaintiffs argue that this loan shows that Greystone was inadequately capitalized and had to be supported from its parent company Coleridge. The Court disagrees. This loan occurred in 2000—almost 11 years prior to Greystone's demise. At the time of the loan, Coleridge was a 50 percent owner of Greystone. There is no other evidence that Coleridge provided any other capitalization over the next 11 years. Furthermore, there is no evidence that the infusion of this money gave Coleridge or Jelniki any

---

[28] Two people testified that Coleridge loaned money to Greystone while a third person testified that JDV (a subsidiary of Coleridge) loaned the money. The Court will view the fact in the light most favorable to Plaintiffs and construe the loan to be one from Coleridge.

[29] *Quarles*, 504 F.2d at 1363 (citations omitted).

control or input over Greystone's decisions and dealings.[30] Finally, the evidence also demonstrates that Greystone was expected to repay this loan, but it was simply unable to do so.

There also is nothing unusual about Coleridge owning the building that Greystone occupied. Again, Coleridge is the parent corporation of Greystone, and it may have some involvement with its subsidiary company or provide some financing. There is no requirement that it have *no* involvement. In this instance, the evidence demonstrates that Greystone leased the building from another one of Coleridge's companies.[31] There is no evidence that Greystone did not pay for its lease nor is there any evidence that there was anything improper in the way in which the lease was structured. Nor is there any evidence of how this fact would demonstrate that Coleridge or Jelniki were involved in Greystone's daily operations or exerted any control over Greystone's daily operations.

As to Eugene Reynolds' interactions with Greystone, he was a member of Greystone's board and its president. He was also an owner of Coleridge and Jelniki and on their boards of directors. "The [common] identity of officers and directors is insufficient to allow corporate veil piercing."[32] It is a well-established principle that "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."[33] Here, there is still no credible evidence that any actions

---

[30] *See Cotracom Commodity Trading AG v. Seaboard Corp.*, 94 F. Supp. 2d 1189, 1196 (D. Kan. 2000) (noting that there was insufficient evidence of a subsidiary's undercapitalization or of a parent's control over the subsidiary with financing to justify treating the subsidiary and the parent as one corporation).

[31] Greystone Investment Company was owned by JDV, Co. (which was also owned by Coleridge).

[32] *Lowell Staats Mining Co. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1263 (10th Cir. 1989) (citations omitted).

[33] *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (quotation marks and citation omitted).

Reynolds took when he discharged his duties as an officer of Greystone were on behalf of Coleridge and/or Jelniki.

With regard to the March 15, 2007, one-page document stating that a meeting would be set up for union members to communicate their concerns directly to the owner, there is no additional evidence demonstrating that Coleridge and Jelniki were involved in the day-to-day management of Greystone.[34] The letter itself states that it would not be a negotiating session and that it would be off the record. In addition, Reynolds testified that he does not recall that the meeting ever happened. This letter is the *only* evidence that Reynolds acted on behalf of Coleridge and Jelniki. Plaintiffs cannot point to any evidence that this meeting ever occurred. Finally, the evidence demonstrates that Lloyd had the ultimate authority to approve a union contract and that Lloyd did not need approval from anybody else (from Coleridge or Jelniki) to make decisions on behalf of Greystone.

Plaintiffs contend that Reynolds and Walsh both gave advice and guidance to Greystone and thus were actively participating in the business of Greystone. However, Walsh testified that he only visited Greystone approximately four times during the 12 years of Coleridge and Jelniki ownership of Greystone. In addition, the last time Walsh visited was in 2005—almost six years before Greystone went out of business. Thus, there were approximately six years of no interaction by Walsh with Greystone. With regard to Reynolds, there are more interactions between him and Lloyd. However, there is no evidence that these interactions were on behalf of Coleridge and Jelniki. Instead, the evidence shows that Reynolds' contacts occurred in his capacity as one of

---

[34] This one-page agreement is the one in which the Tenth Circuit found ambiguous as to whether Coleridge and Jelniki could be involved in the day-to-day operations of Greystone.

Greystone's directors. The "monitoring [of a] subsidiary's performance, supervising the subsidiary's finance and capital budget decisions, and articulating general policies" does not generally "rise to the level necessary to impute the subsidiary's jurisdictional contacts to the parent."[35] Thus, even if Reynolds and Walsh did monitor and consult with Lloyd about Greystone's performance, there is no evidence that this involvement amounted to Coleridge and Jelniki being involved in the daily affairs of Greystone. In sum, there is no additional evidence that Coleridge and Jelniki were involved in the day-to-day management of Greystone or in the negotiation of the CBA.

Furthermore, to exercise "specific jurisdiction over a foreign defendant," the defendant must have "purposefully directed its activities at the forum *and* the plaintiff's injuries [must have arisen] from the defendant's forum-related activities."[36] Plaintiffs' injury arose because Greystone went out of business and withdrew from the fund. There is no evidence that Plaintiffs' injuries arose from Reynolds' and Walsh's limited contacts (on behalf of Coleridge and Jelniki) with the United States. Thus, the Court finds that there are insufficient minimum contacts by Defendants, and the exercise of personal jurisdiction does not comport with due process.

---

[35] *City of Greenville v. Sygenta Crop Prot., Inc.*, 830 F. Supp. 2d 550, 555-56 (S.D. Ill. 2011) (citing 16 James Wm. Moore *et al.*, *Moore's Federal Practice* § 108.42[3][b] (3d ed. 2011)).

[36] *GCIU-Employer Ret. Fund*, 700 F. App'x at 868 (emphasis added) (citation omitted).

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss (Doc. 39) is hereby **GRANTED**.

**IT IS SO ORDERED**.

Dated this 8th day of July, 2019.

*[signature]*
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE